AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

District of Delaware

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

information associated with ████████ that is stored at premises controlled by Google, Inc., 1600 Amphitheatre Parkway, Mountain View, CA 94043

Case No. 15- 187м

SEALED UNSEALED 6/30/17 KTK

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A.

located in the    Northern    District of    California    , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B.

REDACTED

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 1347 | Health Care Fraud |
| 18 U.S.C. 1349 | Conspiracy to Commit Health Care Fraud |

The application is based on these facts:

See attached Affidavit.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Special Agent David F. Bole, FBI

*Printed name and title*

Sworn to before me and signed in my presence.

Date: 11/25/15

*Judge's signature*

City and state: Wilmington, Delaware

The Honorable Mary Pat Thynge

*Printed name and title*

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH ██████████████THAT IS STORED AT PREMISES CONTROLLED BY Google, Inc., 1600 Amphitheatre Parkway, Mountain View, CA 94043 | Case No. *15-187m*<br><br>**Filed Under Seal** |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, David F. Bole, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application for a search warrant for information associated with a certain account, ████████████████ (the "TARGET ACCOUNT"), that is stored at premises controlled by Google, Inc., an email provider headquartered at 1600 Amphitheatre Parkway, Mountain View, California 94043.   The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), and Rule 41 of the Federal Rules of Criminal Procedure, to require Google, Inc. to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2.     I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been so employed since July of 1998. As a Special Agent with the FBI, I am authorized to investigate violations of the laws of the United States and to execute search warrants issued

pursuant to Rule 41 of the Federal Rules of Criminal Procedure.  I am currently assigned to the criminal investigative squad of the FBI's Dover, Delaware Resident Agency, Baltimore Division. I have been trained in investigating white collar crime matters and have experience in cases relating to various types of fraud and other criminal activity, including health care fraud, bank fraud, mortgage fraud, complex financial crimes, election fraud and public corruption.  In my experience as a Special Agent with the FBI, I have prepared, assisted and/or participated in the execution of numerous search warrants conducted at physical locations and of email accounts. In my training and experience, I have become familiar with the basics of email communications and how such communications are used in day-to-day business activities.

3.      All information contained in this affidavit is either personally known to your Affiant or has been related to your Affiant by other law enforcement agents.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that DR. ZAHID ASLAM (hereinafter referred to as "ASLAM") and others have violated the following federal criminal statutes:  18 U.S.C § 1347 (Health Care Fraud) and § 1349 (Conspiracy to Commit Health Care Fraud).  There is also probable cause to search the information described in Attachment A for evidence, instrumentalities or fruits of these crimes, as further described in Attachment B.

## JURISDICTION

5.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated" as

defined by 18 U.S.C. § 2711(3)(A)(i).  Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

**PROBABLE CAUSE TO SEARCH THE TARGET ACCOUNT**

**I.      STATUTES AT ISSUE**

6.      Title 18, United States Code, Section 1347 makes it a crime to knowingly and willfully execute, or attempt to execute, a scheme or artifice (1) to defraud any health care benefit program; or (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services.

7.      Title 18, United States Code, Section 1349 makes it a crime to attempt or conspire to commit a violation of Section 1347.

**II.     EVIDENCE OF HEALTH CARE FRAUD**

8.      This Affidavit sets forth probable cause for three types of health care fraud schemes in which ASLAM and others have participated.  These schemes include: (1) ASLAM's submission of Medicare and Medicaid claims for services that falsely list a doctor who did not perform the services as the provider of the services; (2) ASLAM's submission of Medicare and Medicaid claims for services that falsely list himself as the provider, when he did not perform or supervise the services; and (3) ASLAM's submission of Medicare claims for Durable Medical Equipment ("DME") that did not qualify for reimbursement under Medicare.  Each scheme shall be addressed in turn following a brief overview of the Medicare Program.

3

**A.     Background of the Medicare and Medicaid Programs**

9.     The Medicare program is a federal health insurance program that provides health care services for persons 65 and older and other qualified disabled persons. Under Medicare, the United States Government pays certain covered medical expenses for eligible persons. Part B of the Medicare program covers payments for physician services and DME.    Medicare will only reimburse health care providers for services and DME that are medically necessary for treatment of a specific diagnosis.

10.     Medicaid is a state and federally-funded health care benefit program which provides coverage for medical expenses of low-income, elderly, and disabled patients.

11.     In order to be eligible to receive payment from Medicare or Medicaid, health care providers must have a recognized provider number ("NPI number") and must be enrolled in the Medicare or Medicaid program through the filing of an acceptable application.    To receive reimbursement from Medicare or Medicaid, health care providers must file a claim for payment on a form known as a "Health Insurance Claim Form."   The Health Insurance Claim Form includes information such as the beneficiary's name and address, the date and type of service, the place of service, a diagnosis code indicating the patient's diagnosis, the amount billed by the provider, and other information.  The type of service provided to the beneficiary is described by what is called a Current Procedural Terminology (CPT) code, which is a uniform standard of codes assigned by the American Medical Association for reporting health care services and procedures.

12.     Some CPT procedure codes may be used only if a procedure was performed personally by a physician.   Other codes can be used for procedures performed by trained personnel with appropriate physician supervision, and the amount of supervision required

4

depends on the procedure code being billed.  Absent certain limited exceptions, under Medicare and Medicaid rules, a provider cannot submit a claim for reimbursement under his own NPI number unless the provider either personally performed the service or provided appropriate supervision over another practitioner licensed to perform the service.

**B.      False Billing Using** ███████████ **NPI Number**

13.      In November 2013, your Affiant first learned that ASLAM was submitting Medicare and Medicaid claims using the NPI Number of a physician who had not actually performed the medical services.

14.      On November 25, 2013, your Affiant interviewed ███████████████ told your Affiant that he began working for ASLAM in April 2013, and was, at that time, the Chief Executive Officer of eleven "satellite" medical offices owned by ASLAM.  These offices consisted of seven walk-in medical centers doing business as "Got-A-Doc Walk-In Medical Centers," three primary care offices, and one behavioral health practice.  ███████ stated that ASLAM also owned the Alpha Medical Center in Elkton, Maryland (located in a former Wal-Mart store), which consisted of multispecialty groups, an imaging department, a pharmacy and a laboratory.

15.      During the interview ███████ stated that he had assisted ASLAM in the negotiation and purchase of the Doc-In-A-Box Walk-In Medical Center in Camden, DE—later renamed Got-A-Doc Walk-in Medical Center ("Got-A-Doc - Camden")—from ███████████████ and ███████████████ in May 2013.  ███████ stated that, after the sale, he was initially under the impression that ███████ was the Medical Director of the clinic, since ███████ had been present at a pre-sale meeting during which ASLAM and ███████████ negotiated for ███████████ o remain as the Medical Director.

5

16.     However, ████ quickly learned that his initial impression was inaccurate. During the first week of November 2013, ASLAM asked ████████ a Physician Assistant at the Got-A-Doc - Camden, to assist with accrediting the clinic with the American Academy of Urgent Care Medicine.  During the course of the accreditation process, ████ sked ████ or the name of the clinic's Medical Director. ████ gave ██████████████, as ██ elieved that ████████ was the Medical Director.  However, ██ later learned from ██ that ██ had contacted ████████ nd ████████ told ████ hat he had no association with the clinic after it was sold to Aslam in June 2013.

17.     On November 22, 2013, your Affiant interviewed ████████ ████ onfirmed that, as part of the accreditation process for the Got-A-Doc - Camden, he contacted ████ and learned that he hadn't had any association with the clinic since he sold it to Dr. Aslam. ████ further told your Affiant that he contacted ASLAM on November 5 or 6, 2013, and informed him that the Got-A-Doc - Camden needed to list a Medical Director on an accreditation application. ████ sked ASLAM if he should contact ████████ to fill the position.  ASLAM told ████ ot to contact ████████ because he would want to get paid, and directed ██ to list ████████ as the Medical Director.

18.     ████ informed your Affiant that he had a meeting with ASLAM on or about November 13, 2013, during which ████ ld ASLAM that ████████ ad denied being the Medical Director for the clinic.  In response, ASLAM admitted to ████ that he had never completed the negotiations with ████████ o remain at the clinic as the Medical Director and further added, "Oh yeah, I guess we should offer him some money."

19.     ████ old your Affiant that he subsequently checked the billing records for Got-A-Doc - Camden and learned that the clinic had been submitting bills to Medicare, Medicaid,

and private insurance companies under ██████████ NPI number after ASLAM purchased the clinic, despite the fact that ██████████ did not render any services there during that time period.

20.    On November 25, 2013, ██████ conducted a consensually recorded telephone conversation with ASLAM that was monitored by the FBI.  During the telephone conversation, ASLAM acknowledged that he was not paying ██████████ as Medical Director for Got-A-Doc - Camden; stated that it was necessary to bill under ██████ because the facility had not yet received its credentialing; and claimed that ██████ was aware that the facility was going to bill under his name.  In particular, ASLAM stated that, "We bought the company and there's no credentialing, so how do you expect someone to bill . . . that was part of the deal which I made with them, the billing will go through him[.]"

21.    On November 27, 2013, your Affiant interviewed ██████████ ██████████ advised that he had not worked at Got-A-Doc - Camden since early June 2013.  ██████████ stated that he had negotiated with ASLAM in an attempt to stay involved with the clinic, such as serving as its Medical Director, but that those negotiations were never completed. ██████████ reviewed Medicare, Medicaid, and private insurance records provided by your Affiant, which indicated that ██████ had provided services to numerous patients at Got-A-Doc - Camden between October 14, 2013 and November 24, 2013.  ██████ advised that he did not know that his NPI number was being used to submit claims, that he was not present at the clinic during the time period in question, and that there was no way to justify listing him on the claims as the physician who provided care.  S██████ further denied that he allowed ASLAM to use his NPI Number to bill for services while Got-A-Doc - Camden was going through its credentialing process.

7

22.     Your affiant analyzed Medicare and Medicaid billing records for the Got-A-Doc -
Camden from June 3, 2013 to December 31, 2013.  The following summary chart shows claims
that were improperly submitted to government health care programs under ▮▮▮▮▮▮ NPI
number during that time period for services allegedly performed at the Got-A-Doc - Camden:

|  | BILLED CLAIMS | | PAID CLAIMS | |
|---|---|---|---|---|
| INSURER | # | $ | # | $ |
| MEDICARE | 521 | $106,857 | 436 | $35,810 |
| MEDICAID | 160 | $20,230 | 28 | $1,131 |
| MEDICAID (United Health Group) | 778 | $153,634 | 686 | $70,265 |
| TOTAL | 1,459 | $280,721 | 1,150 | $107,206 |

23.     ▮▮▮▮ advised your Affiant that he regularly communicated with ASLAM via
email regarding the business matters of the Got-A-Doc Walk-In Medical Clinics and ASLAM's
other    satellite    offices,    and    that    ASLAM    used    the    following    email    address:
▮▮▮▮▮▮▮▮▮▮  further recalled that he had frequent telephone conversations
with ASLAM regarding the scheduling of providers and/or billing at the Got-A-Doc Walk-In
Medical Clinics for services rendered at those clinics, and that ▮▮▮ and ASLAM occasionally
followed-up on those telephone discussions with additional communications over email. ▮▮▮▮
last communicated with ASLAM at ▮▮▮▮▮▮▮▮ when he sent ASLAM his
resignation letter on November 29, 2013.

8

### C.    False Billing Using ASLAM's NPI Number

24.    In addition to evidence that ASLAM permitted false Medicare and Medicaid claims to be submitted from the Got-A-Doc – Camden location using          NPI Number, your Affiant also learned during the investigation that ASLAM permitted his own NPI Number to be used across his Got-A-Doc locations for services that he did not perform or supervise.

25.    Your Affiant interviewed          on multiple occasions between March 2015 and November 2015.      told your Affiant that she was internally promoted by ASLAM to take over Truitt's position, and that she was the Director of Operations for all of ASLAM's Got-A-Doc locations from December 2013 until April 7, 2015, when she left the organization.

26.      told your Affiant that ASLAM did not routinely examine or treat patients, but that his walk-in clinics regularly submitted claims for reimbursement to Medicare, Medicaid, and private insurance companies as though he was the provider. ASLAM did so because many of his employees were not properly credentialed with government or private insurance.

27.    Your Affiant analyzed Medicare and Medicaid billing records for all of ASLAM's Got-A-Doc Walk-In Medical Center locations between January 1, 2013, and October 2, 2015. The following summary chart shows claims submitted to Medicare and Medicaid by the Got-A-Doc Walk-In Medical Center locations under ASLAM's NPI number during that time period, with a second column depicting claims submitted under ASLAM's NPI number while ASLAM was not even in the United States:

9

| | Part B (ASLAM office visits) January 1, 2013 – October 2, 2015 | Part B (ASLAM out of country) |
|---|---|---|
| Claims | 8,659 | 140 |
| Billed | $1,687,306 | $23,850 |
| Paid | $551,676 | $9,428 |

28.    A check of the Treasury Enforcement Communications System (TECS) showed that ASLAM was in Pakistan from September 28, 2013 through October 5, 2013, and again from July 25, 2015 through August 1, 2015.  However, as shown in the chart above, 140 claims were submitted by the Got-A-Doc Walk-In Medical Centers to Medicare and Medicaid under ASLAM's NPI number during time periods in which he was out of the country.

29.    In addition, claims submitted by the Got-A-Doc Walk-In Medical Centers to Medicare and Medicaid under ASLAM's NPI number include numerous claims for services that are generally performed by a physician.   For example, Got-A-Doc billed Medicare under ASLAM's NPI number for the following services generally performed by a physician:

10022  Needle aspiration with imaging guidance

15851  Suture removal by surgeon under general anesthesia

20550  Therapeutic injection of single tendon or ligament

20610  Arthrocentesis, major joint or bursa

49320  Peritoneoscopy

57454  Colposcopy with biopsy

58558  Hysterscopy, surgical with biopsy

58670  Laproscopy, surgical

64435  Nerve block

10

30. ████ also told your Affiant that the Got-A-Doc Walk-In Medical Centers in Sussex County had also billed under the NPI numbers assigned to ████████ and ██ ████████ According to ████ neither I████████ nor ██████ saw patients at the Sussex County clinics.

31. ████ further stated that the walk-in clinics had billed patients under the NPI numbers for ASLAM, I████████████████ when the patients had actually been seen by ████ ████████.

32. ████ advised your Affiant that, during the course of her employment relationship with ASLAM, she regularly communicated with him about business matters via email at the following address: ████████████ Your Affiant reviewed a number of emails in which ████ corresponded with ASLAM at that email address. ████ further told your Affiant that she made the work schedule for the medical providers at the Got-A-Doc Medical Walk-In Centers and that she frequently corresponded with ASLAM via email regarding the providers' work schedules. She further told your Affiant that ASLAM instructed her via email to bill Medicare and other insurers as though ASLAM and other physicians had provided the services, despite the fact that the services were actually provided by different individuals.

**D.   Durable Medical Equipment Fraud**

33. On October 19, 2015, your Affiant interviewed T████████ regarding her previous employment at MedTix Home Medical Equipment & Respiratory Care Company. ████ stated that MedTix is a DME company that supplies Continuous Positive Airway

---

[1] In 2006, ████ was convicted in Delaware state court of Felony Delivery of a Narcotic Schedule II Controlled Substance, Felony Health Care Fraud, and Felony Conspiracy to Commit Health Care Fraud. His license to practice medicine in Delaware was revoked for a period of time but the Delaware Division of Professional Regulation Online Licensee Verification service indicates that he was issued a new license on March 6, 2013.

Pressure ("CPAP") machines, BiLevel Positive Airway Pressure ("BIPAP") machines, nebulizers and oxygen equipment, among other items.

34. ████████ dvised that ASLAM purchased MedTix from ████████ in August 2013. ████████ tated that the company had two locations in Lewes and Milford at the time of the sale to ASLAM, but that ASLAM later added additional locations in Dover, Millsboro, Seaford and Salisbury.

35. ████████ already worked at MedTix when it was purchased by ASLAM, and she remained employed there until she left the company in February 2015. ████████ stated that from the beginning of her contact with ASLAM, he indicated that he wanted to refer patients from his Got-A-Doc Walk-In Clinic locations to MedTix. ████████ ecalled numerous arguments that she had with ASLAM where she told him that referring patients from Got-A-Doc to MedTix violated the Stark Law (42 U.S.C. § 1395nn, 42 C.F.R. § 411.350 through 411.389) because ASLAM owned both businesses.[2] ████████ believed that ASLAM knew that the referrals from Got-A-Doc to MedTix were illegal because he told the MedTix staff that they should substitute the name of another doctor on prescriptions for DME that bore ASLAM's name.

36. Your Affiant reviewed Medicare claims for beneficiaries who received services from a Got-A-Doc Walk-In Medical Center and DME from MedTix, and your Affiant located

---

[2] The Stark Law, a civil statute, prohibits (absent specific exemptions) a physician from making referrals for certain designated health services payable to Medicare to an entity with which he or an immediate family member has a financial relationship; and further prohibits (absent specific exemptions) the entity from presenting or causing to be presented claims to Medicare for those referred services. Durable medical equipment and supplies are considered to be items or services that constitute designated health services under the Stark Law.   42 U.S.C. § 1395nn.   A physician's prohibited financial relationship with an entity that furnishes DME is imputed to his group practice and members of its staff if the physician directs the group practice, its members, or its staff to make the referral or if the physician controls referrals made by his group practice, its members, or its staff. 42 C.F.R. § 411.353.

examples where ASLAM was listed as the rendering provider on the Got-A-Doc claims but another Got-A-Doc provider was listed as the referring physician on the MedTix claim.

37.   ████ further recalled many instances when ASLAM instructed MedTix employees to "resupply" customers with certain items (e.g., CPAP masks and pumps) automatically even when the customer had never requested to be resupplied.  According to ████ f a MedTix employee could not get a hold of the customer to find out if they needed more supplies, ASLAM instructed the employee to send the supplies anyway, and Medicare, Medicaid or a private insurer would be billed for those supplies. ████ recalled receiving numerous complaints from customers about receiving unnecessary supplies that they had not requested.

38.   In addition ████ dvised that many DME prescriptions submitted to MedTix contained diagnosis codes that did not qualify the patient for reimbursement from Medicare. According to ████ ASLAM instructed MedTix employees to submit the claims to Medicare with an altered diagnosis code that would qualify for reimbursement by Medicare.

39.   A check of Medicare billings from August 18, 2013 through October 2, 2015 showed that MedTix submitted 3,320 claims for Got-A-Doc patients which resulted in Medicare being billed $965,170. Ultimately, Medicare paid $442,451 of the amount billed.

40.   ████ told to your Affiant that she regularly communicated with ASLAM via email regarding MedTix business matters, and that ASLAM used the following email address: ████████ ████ further advised that she once emailed ASLAM (at ████████ he provisions in the Stark Law that prohibited a business-owner from referring patients to another medical business they own.

13

**E.      ASLAM is Actively Using His Email to Communicate Regarding His Medical Businesses**

41.    On October 7, 2015, the Honorable Sherry R. Fallon, United States Magistrate Judge for the District of Delaware, signed a pen register trap and trace order for ASLAM's email address: ███████████ A review of the records obtained pursuant to the aforementioned order show that between October 20, 2015 and November 18, 2015, ASLAM had in excess of 1,000 contacts with email addresses associated with his medical businesses.

42.    On September 25, 2015, Google, Inc. was requested pursuant to Title 18, United States Code, Section 2703(f) to preserve all stored communications, records, and other evidence then in its possession regarding the email account ██████████ for a period of 90 days.  On September 27, 2015, Google, Inc. confirmed that it would retain such records for a period of 90 days.

**F.      Further information about ASLAM**

43.    ASLAM holds active licenses to practice medicine in at least Delaware, New Jersey, and Maryland.  The Maryland Board of Physicians Practitioner Profile System states that his "License Status" there is **Probation**."  According to the Maryland Board of Physicians Practitioner Profile System, ASLAM was reprimanded in 2013 by the Maryland State Board of Physicians based on charges that he consistently failed to appropriately document his treatment rationale for prescribing Controlled Dangerous Substances to pregnant patients, failed to counsel patients regarding the use of narcotics during pregnancy, ordered excessive sonograms and biophysical profiles in the absence of documented medical indications to support the frequency with which the tests were ordered ("grossly overutiliz[ed] health care service[s]"), and failed to maintain adequate medical records.

14

44.     Pursuant to a consent order, ASLAM was placed on probation for a minimum of twelve months and ordered to complete courses in medical documentation, controlled dangerous substances prescribing, clinical indications for diagnostic studies, and medical ethics.

45.     Subsequently, in January 2014, ASLAM received a reprimand for violating the portion of the Maryland Medical Practice Act that prohibits paying a person for bringing or referring a patient.

## BACKGROUND CONCERNING EMAIL

46.     In my training and experience, I have learned that Google, Inc. provides a variety of on-line services, including electronic mail ("email") access, to the public. Google, Inc. allows subscribers to obtain email accounts at the domain name gmail.com, like the email account[s] listed in Attachment A. Subscribers obtain an account by registering with Google, Inc. During the registration process, Google, Inc. asks subscribers to provide basic personal information. Therefore, the computers of Google, Inc. are likely to contain stored electronic communications (including retrieved and un-retrieved email for Google, Inc. subscribers) and information concerning subscribers and their use of Google, Inc. services, such as account access information, email transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

47.     In general, an email that is sent to a Google, Inc. subscriber is stored in the subscriber's "mail box" on Google, Inc.'s servers until the subscriber deletes the email. If the subscriber does not delete the message, the message can remain on Google, Inc.'s servers indefinitely. Even if the subscriber deletes the email, it may continue to be available on Google, Inc.'s servers for a certain period of time.

48.    A Google, Inc. subscriber can also store with the provider files in addition to emails, such as address books and contact or buddy lists and other files, on servers maintained and/or owned by Google, Inc.  In my training and experience, evidence of who was using an email account may be found in address books, contact or buddy lists, email in the account, and attachments to emails, including pictures and files.

49.    In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account.  Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.  Based on my training and my experience, I know that even if subscribers insert false information to conceal their identity, I know that this information often provide clues to their identity, location or illicit activities.

50.    In my training and experience, email providers typically retain certain transactional information about the creation and use of each account on their systems.  This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account.  In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account.  Because every device that connects to the Internet must use an IP address, IP

16

address information can help to identify which computers or other devices were used to access the email account.

51.     In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

52.     As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by the email provider can show how and when the account was accessed or used. For example, as described below, email providers typically log the Internet Protocol (IP) addresses from which users access the email account along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can

understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (e.g., location information integrated into an image or video sent via email). Last, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

## **CONCLUSION**

53.     Based on the forgoing, your Affiant respectfully requests that the Court issue the proposed warrant to search the TARGET ACCOUNT as identified in Attachment A and to seize the items specified in Attachment B. Because the warrant will be served on Google, Inc., who will then compile the requested records at a time convenient to it, there exists reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

18

## REQUEST FOR SEALING

54.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

Respectfully submitted,

David F. Bole
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on _____November 25_____, 2015

Honorable Mary Pat Thynge
UNITED STATES MAGISTRATE JUDGE

19

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with email account █████████████ that is stored at premises controlled by Google, Inc., a company that accepts service of legal process at Google, Inc., 1600 Amphitheatre Parkway, Mountain View, CA 94043.

## ATTACHMENT B

### Particular Things to be Seized

I.       **Information to be disclosed by Google, Inc. (the "Provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f) on September 25, 2015, the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.       The contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

b.       All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.       The types of service utilized;

d.       All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

e.       All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

**II.     Information to be seized by the government**

All information described above in Section I that constitutes fruits, contraband, evidence and instrumentalities of violations of Title 18 U.S.C §§ 1347 and 1349, those violations involving DR. ZAHID ASLAM and occurring after April 1, 2013, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

      (a) The submission of false or fraudulent health care claims for services rendered at Got-A-Doc Walk-In Medical Centers;

      (b) The submission of false or fraudulent health care claims for durable medical equipment by MedTix Home Medical Equipment & Respiratory Care Company;

      (c) Evidence that identifies current or former employees or contractors of Got-A-Doc Walk-In Medical Centers and/or MedTix Home Medical Equipment & Respiratory Care Company, including evidence that identifies all current or former employees or contractors who prepared or assisted in the preparation of claims to Medicare and Medicaid;

      (d) Records of appointments, calendars, and schedules of ZAHID ASLAM;

      (e) Any document that identifies the NPI(s)/provider number(s) issued from Medicare/Medicaid to ZAHID ASLAM, █████████████ or any other provider employed or contracted by Got-A-Doc Walk-In Medical Centers;

      (f) Communications between ZAHID ASLAM and current or former employees or contractors of Got-A-Doc Walk-In Medical Centers and/or MedTix Home Medical Equipment & Respiratory Care Company regarding:

            a.   The submission of claims or bills for health care services and/or durable medical equipment by Got-A-Doc Walk-In Medical Centers and/or

2

MedTix Home Medical Equipment & Respiratory Care, including the
usage of diagnosis codes and/or CPT codes;

    b.  The provision of health care services and/or durable medical equipment at
Got-A-Doc Walk-In Medical Centers and/or MedTix Home Medical
Equipment & Respiratory Care;

    c.  Statutes, rules and/or regulations governing the provision of services to
Medicare or Medicaid beneficiaries and/or the submission of claims to
Medicare or Medicaid; and

    d.  Patient and/or provider schedules associated with Got-A-Doc Walk-In
Medical Centers and/or MedTix Home Medical Equipment & Respiratory
Care;

(g) Communications between ZAHID ASLAM and ▓▓▓▓▓▓▓ regarding Doc-
In-A-Box Walk-In Medical Center in Camden, DE (later renamed Got-A-Doc
Walk-In Medical Center);

(h) Evidence that identifies the location and manner of storage of any medical
records, charts, and documentation for services and durable medical equipment
provided by Got-A-Doc Walk-In Medical Centers and/or MedTix Home Medical
Equipment & Respiratory Care;

(i) Evidence indicating how and when the email account was accessed or used, to
determine the geographic and chronological context of account access, use, and
events relating to the crime under investigation and to the email account owner;

(j) Evidence indicating the email account owner's state of mind as it relates to the
crimes under investigation;

3

(k) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s); and

(l) The identity of the person(s) who communicated with the user ID about matters relating to the submission of false or fraudulent health care claims for services or durable medical equipment by Got-A-Doc Walk-In Medical Centers or MedTix Home Medical Equipment & Respiratory Care Company, including records that help reveal their whereabouts.

4